# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

Case No. 5D2023-1513
LT Case Nos. 2016-CA-0074
2016-CA-1163

———————————————

ATLANTIC CANDY COMPANY n/k/a
WHETSTONE INDUSTRIES, INC.,
and HENRY WHETSTONE, JR.,

     Appellants/Cross-Appellees,

     v.

YOWIE NORTH AMERICA, INC.,
and YOWIE EQUIPMENT
HOLDING, INC.,

     Appellees/Cross-Appellants.

———————————————

On appeal from the Circuit Court for St. Johns County.
Howard M. Maltz, Judge.

W. David Talbert, II, of the Talbert Law Firm, Jacksonville, and
Rebecca Bowen Creed and Dimitrios A. Peteves, of Creed &
Gowdy, P.A., Jacksonville, for Appellants/Cross-Appellees.

J. Kirby McDonough, of Spencer Fane LLP, Tampa, and
Joshua C. Dickinson and Thomas Hiatt, of Spencer Fane LLP,
Kansas City, Missouri, Pro Hac Vice, for Appellees/Cross-
Appellants.

January 10, 2025

EISNAUGLE, J.

In this breach of contract case, Appellants/Cross-Appellees, Atlantic Candy Company, n/k/a Whetstone Industries, Inc., and Henry Whetstone, Jr. (collectively referred to as "Whetstone"), appeal a final judgment for Appellee/Cross-Appellant, Yowie North America Inc. ("Yowie"), on Whetstone's complaint alleging that Yowie breached License and Manufacturing Agreements when Yowie discontinued ordering products from Whetstone.[1] We affirm as to all issues but write to explain why Yowie did not breach the agreements.

I.

Mr. Whetstone owned two patents to produce a chocolate-toy combination product (a chocolate covered capsule with an inedible toy inside). At the time the parties entered into the License Agreement, Mr. Whetstone's patents were the only means to produce a chocolate-toy combination product approved by the Food and Drug Administration ("FDA"). These patents expired by or before 2019.

In 2012, Mr. Whetstone and Yowie entered into two contracts—a License Agreement and a Manufacturing Agreement. The License Agreement authorized Yowie to use Mr. Whetstone's patents to manufacture its chocolate-toy combination products for sale in the United States, Canada, and Mexico. Importantly, the License Agreement did not require Yowie to order any minimum amount of the product from Whetstone. Instead, Yowie would pay a fee for each product it actually sold until January 1, 2028. In short, Yowie agreed to pay Whetstone a fee for products it sold using the patents for roughly eight years after the patents expired.[2]

---

[1] Yowie cross-appeals the trial court's ruling that it breached a Manufacturing Agreement between the parties by failing to fully pay two invoices.

[2] The parties entered into an initial version of each agreement but Yowie almost immediately had difficulty meeting its

Important to this appeal, the License Agreement gave Yowie the exclusive right to use the patents if it paid Whetstone certain specific Minimum Fees by December 31 of each calendar year. On the other hand, the License Agreement provided that Yowie could maintain non-exclusive rights if it paid a schedule of lower Minimum Fees, as follows:

> **Section 5. Minimum Fees to Maintain Non-Exclusive Rights.** In the event Yowie fails to meet the minimum fees for exclusivity and provided that Yowie is not in default of any agreements with Whetstone Chocolate Factory, Inc., Whetstone, or Whetstone Industrial Holdings, Inc., Yowie *shall have the right* to utilize the Patents and Technology on a nonexclusive basis ("Non-Exclusivity"), provided that the following Minimum Fees for Non-Exclusivity are paid to Whetstone by December 31 of each calendar year.

**Minimum Fees to Maintain Non-Exclusive Rights**

| Year | Fee Amount |
|------|------------|
| 2013 | $150,000 |
| 2014 | $250,000 |
| 2015 | $400,000 |
| 2016 | $500,000 |
| 2017 | $500,000 |

---

obligations. As a result, the parties amended both agreements, reducing the payments Yowie owed to Whetstone and providing that the Manufacturing Agreement would expire on December 21, 2025. Our description of the agreements reflects these amendments.

2018                                    $500,000

2019                                    $500,000

> If any of the above Minimum Fees are not paid by December 31st of any year, then Whetstone shall have the right, at his sole discretion, to immediately terminate this Agreement in which case Yowie shall immediately cease manufacturing all Products.

(emphasis added).

Section 7 of the License Agreement provided that, "[u]nless sooner terminated . . . this Agreement shall automatically expire on December 31, 2027 . . . ." And Section 14 allowed either party to terminate the License Agreement when the other party is in breach and fails to cure.

The Manufacturing Agreement, with limited exception, provided that Whetstone would exclusively produce any of Yowie's product that made use of the patents. That agreement also contained two termination provisions. One provision allowed either party to terminate upon breach by the other party. The second provision authorized either party to terminate for convenience after giving twelve months written notice.

The relationship proceeded for a time until, in late 2015, Yowie notified Whetstone that it would employ a "new manufacturing process that will no longer require use of the [Whetstone] patents." Instead, Yowie sought out, and began producing its products with a different manufacturer using a different patent newly approved by the FDA.

Whetstone filed suit alleging, *inter alia*, that Yowie was required to meet the Minimum Fees for non-exclusivity and that Yowie breached the License Agreement when it failed to maintain non-exclusive rights. In its defense, Yowie argued that the non-exclusivity provision was optional, and that it was only required to meet those Minimum Fees thresholds if it wanted to continue using the Whetstone patents.

4

The case proceeded to a bench trial, where the court concluded that the non-exclusive rights provision in Section 5 did not require Yowie to use the patents at all. As a result, the court rendered final judgment in Yowie's favor as to this part of the dispute. This appeal follows.

## II.

When interpreting any legal text, "we follow the 'supremacy-of-text principle'—namely, the principle that '[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.'" *USAA Cas. Ins. Co. v. Mikrogiannakis*, 342 So. 3d 871, 873 (Fla. 5th DCA 2022) (alteration in original; citation omitted); *see also Halifax Hosp. Med. Ctr. v. Glob. Trauma Sys., Inc.*, 386 So. 3d 1054, 1056 (Fla. 5th DCA 2024).[3] "[E]very word employed in [a legal text] is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it." *Richman v. Calzaretta*, 338 So. 3d 1081, 1082 (Fla. 5th DCA 2022) (alteration in original; citation omitted). "Importantly, '[c]ontext always matters because sound interpretation requires paying attention to the whole law, not homing in on isolated words or even isolated sections.'" *Id.*

Of course, "context includes the purpose of the text." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 56 (2012). But "the purpose must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires." *Id.*

Once the purpose of a text is narrowly defined, it "sheds light only on deciding which of various *textually permissible meanings* should be adopted." *Id.* at 57 (emphasis added). Courts cannot use context or purpose "to contradict text or to supplement it" because "the limitations of a text—what the text chooses not to do—are as much a part of its 'purpose' as its affirmative dispositions." *Id.*; *see also State v. McKenzie*, 331 So. 3d 666, 671 (Fla. 2021) ("Context is

---

[3] We review the trial court's interpretation of a contract *de novo. See MacKenzie v. Centex Homes by Centex Real Est. Corp.*, 281 So. 3d 621, 624 (Fla. 5th DCA 2019).

important as 'a tool for understanding the terms of the law, not an excuse for rewriting them.'") (citation omitted).

## III.

On appeal, Whetstone concedes—as it must—that the License Agreement "does not explicitly state that Yowie was required to pay [the Minimum Fees]." Indeed, there is no mandatory language in the non-exclusivity provision at all. In fact, the language is decidedly permissive, and gives Yowie the *right* to maintain non-exclusive use of the patents "provided that" it pays the minimum fees. According to the agreement's plain terms, if Yowie did not pay the minimum fees, Whetstone had the *option* to terminate the agreement—which would cut off Yowie's access to the patents entirely.

Despite this concession, Whetstone argues that the context and purpose of the License Agreement require us to read the minimum fees as mandatory. As we will explain, Whetstone puts more weight on context and purpose than the text can bear. Given that the text is supreme, we cannot use context and purpose to "contradict" or otherwise modify the text by converting permissive language into a mandate.[4]

First, Whetstone argues that the "parties intended for payment of the fees to continue through 2019" because Section 5 specifies "different annual minimum fees for the years 2013 through 2019." But Whetstone has not explained why a yearly schedule of minimum fees would only apply if the fees were mandatory, and we can identify none. Moreover, the schedule's end date is unsurprising given 2019 is when the patents expired.

Second, Whetstone argues that the expiration provision in Section 7 would be "meaningless," and the License Agreement

---

[4] Whetstone also argues that Yowie breached Sections 7 and 14 by "effectively" terminating the License Agreement when Yowie discontinued all orders. Of course, this argument assumes that Yowie was required to pay the minimum fees for non-exclusive use of the patents.

6

would lack consideration, if Yowie can just stop paying the minimum fees.[5]

But we need not contradict the permissive language in Section 5 to give Section 7 meaning or to identify consideration in the License Agreement. Section 7 dictates that Yowie, if it wishes to use the patents, must pay for such use for roughly eight years after the patents expire.[6] In short, whether or not the minimum fees are permissive or mandatory, Section 7 has meaning and supplies substantial consideration for the License Agreement.

Finally, Whetstone argues that Yowie breached the Manufacturing Agreement "by effectively terminating the agreement in violation of" the termination for convenience clause. Specifically, Whetstone asserts that Yowie "effectively"[7] terminated the Manufacturing Agreement when it discontinued

---

[5] Whetstone also appears to argue that we should read Section 5 of the License Agreement as mandatory because the Manufacturing Agreement (which was entered into at the same time as the License Agreement) expires in 2025. According to Whetstone, this demonstrates "that the purpose of the agreements was for the parties' relationship to continue at least through 2025."

As we have explained, we fail to see how an expiration date on either the License Agreement or the Manufacturing Agreement is dispositive. Whether the minimum fees are permissive or mandatory, the expiration of the agreements is meaningful because, either way, the agreements would continue to control if Yowie wished to use the patents in the future up to and through the date each agreement expired. In the case of the Manufacturing Agreement, this would mean that Yowie, if it wanted to use the patents in the future, would be required to purchase the products from Whetstone through 2025.

[6] The parties agreed at oral argument that anyone can use the patents, absent the requirements of the License Agreement, after they expire.

[7] Whetstone conceded at trial that there was never any "termination of this agreement provided by Yowie to [Whetstone]."

7

orders with Whetstone before termination for convenience was allowed and then started ordering from a different supplier using a different patent.[8]

We are not persuaded for at least two reasons. First, this argument is premised, in part, on Whetstone's belief that the License Agreement required Yowie to continue making orders—a proposition we reject. If Yowie was permitted to discontinue orders with Whetstone, then doing so is not equivalent to a termination for convenience.

Second, by its plain terms, the Manufacturing Agreement only required Yowie to order its chocolate-toy combination product from Whetstone when Yowie used the *Whetstone* patents. Of course, Yowie did not use Whetstone's patents when it ordered from the new manufacturer—and Whetstone has not alleged otherwise. In short, Yowie could not breach the plain language of the Manufacturing Agreement by ordering from an alternative manufacturer using an alternative patent.

## IV.

In conclusion, while a consideration of context and purpose are relevant to a fair reading of a legal text, they cannot authorize a deviation from the "textually permissible meaning" of the language used in the agreements. Therefore, we reject Whetston's invitation to convert the permissive contract language in this case into a mandate.

AFFIRMED.

LAMBERT, J., concurs.
MAKAR, J., dissents with opinion.

---

[8] On appeal, Whetstone argues that the "manufacturing agreement allows a party to terminate for convenience only after giving twelve months' written notice and, in any event, not before December 31, 2019."

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____

Makar, J., dissenting.

Chocolate encased toy animals from Australia, known as Yowies, spawned this business dispute. In 1967, Henry Whetstone, Jr., and his wife started a small business in downtown St. Augustine, Florida, making chocolates and other confections. Years later, Henry developed the know-how to produce chocolate-toy combination products that have two parts: a chocolate shell and a capsule with an inedible toy within. By 2000, he obtained two U.S. patents that his family companies used to produce their own product lines. In the early 2010s, the patents were the only lawful means to manufacture FDA-approved chocolate-toy combination products in the United States. At that time, the patents had only seven years remaining due to an expiration date of 2019, thereafter losing most of their economic value.

Enter Yowie Group, Ltd., which is an Australian business that produces chocolate-toy combination products in its homeland.[1] The Yowie line of products was developed in the mid-1990s and became one of the top-selling chocolate products in Australia. Its namesake, the Yowie, is a creature in Australian folklore of Aboriginal roots that was said to live in the Outback. *See Yowie*, Wikipedia (December 3, 2023, 4:20 PM), https://en.wikipedia.org/wiki/Yowie. After much commercial success, the Yowie line was discontinued in 2005, and went fallow for many years until its leadership decided to relaunch the brand, this time in the United States.

In 2011, Phil Hudson—an Australian who controlled the exclusive rights over the Yowie brand in the United States—met with Henry to discuss the use of the Whetstone patents and the manufacturing of the Yowie line of products by Whetstone's

---

[1] Yowie's subsidiaries are the soon-to-be-mentioned Yowie North America and Yowie Equipment Holding, Inc.

Florida-based chocolate factory for distribution and sale nationwide.[2] Hudson incorporated Yowie North America ("YNA") in March 2012, becoming YNA's initial director and president. Soon thereafter, Henry and Hudson signed the two inter-related agreements that are the focus of the current dispute: a Patent and Technology License Agreement and a Manufacturing Agreement.

The License Agreement granted YNA the right to use the two patents that Whetstone solely owned for the manufacturing and sale of chocolate toy products. YNA was required to pay a percentage (4.5–5%) of its sales of Yowies as a fee, the amount of which would decline after the patents expired. Regardless of the amount of sales, however, YNA was required to pay either an exclusive or non-exclusive minimum annual fee discussed below.

The License Agreement had an expiration date of December 31, 2027,[3] and could be terminated early only if a party breached the agreement and failed to cure within 30 days after notice. The Manufacturing Agreement had no specific end-date and could be terminated for cause on the same basis as was permitted in the License Agreement. Unlike the License Agreement, however, the

---

[2] Henry was the CEO of Whetstone Industries ("Whetstone"), a wholly owned subsidiary of another entity owned by Henry and his wife. Henry is also the president of Whetstone Chocolate Factory, Inc. ("WCF"). Whetstone changed its name to Atlantic Candy Company in April 2015, but changed it back to Whetstone a year later.

[3] The agreement stated:

> **Section 7. Expiration.** Unless sooner terminated as provided below, this Agreement, this Agreement shall automatically expire on December 31, 2027 and the parties shall have no further obligations hereunder, except for those that survive termination or expiration.

The agreement also said that "Beginning January 1, 2028, there shall be no fees and the parties shall have no further obligations hereunder, except for those which survive termination or expiration."

11

Manufacturing Agreement could be terminated for "convenience" by either party via written twelve-month notice, but not prior to December 31, 2019.

In short, either party could back out of the manufacturing relationship, but they could not do so under the licensing arrangement, which could only be terminated prior to 2027 upon an uncured breach.

The relationship had a shaky start. Hudson, who brokered the agreements, was removed in March 2013 and replaced by Wayne Loxton, YNA's new CEO. At that time, YNA had not yet delivered promised machinery and components, resulting in default notices and the postponement of production until December 2013. Loxton soon decided that the deal with Whetstone was not financially sustainable for YNA and met with Henry to renegotiate portions of the agreements, which resulted in a reduction in the minimum licensing fees that YNA would pay for the use of the patents[4]; the Manufacturing Agreement was also amended to have its terms extend to December 31, 2025.

Whetstone then produced over 11 million Yowies for YNA in 2014 and 2015. YNA paid the annual minimum fees due under the License Agreement. Soon thereafter, YNA stopped placing orders, however, and halted payment of the minimum fees due. It announced that it had a new manufacturing partner, Madelaine Chocolate Novelties, Inc., to produce Yowies for the U.S. market, effectively abandoning its business relationship with Whetstone and walking away from the agreements without further payment of licensing fees.

A series of complaints and counterclaims involving the License and Manufacturing Agreements ensued, all of which were consolidated for a non-jury trial. After hearing testimony and reviewing the documentary evidence, including the two agreements, the trial court ruled that YNA breached the

---

[4] The Minimum Fees to Maintain Exclusive Rights and the Minimum Fees to maintain Non-Exclusive Rights are set out in the Appendix.

Manufacturing Agreement in part, awarding Whetstone $114,579.97 in damages, but that YNA did not breach the License Agreement. Whetstone moved for rehearing, which was ultimately denied.[5]

On appeal, the dispositive issue is whether YNA was entitled to walk away from the License Agreement without any consequences, including the responsibility to continue paying licensing fees through 2027 when the patents expire. The language of the License Agreement, read in conjunction with the Manufacturing Agreement, demonstrates it was not free to do so.

First off, appellate review of written agreements is done de novo, meaning that the appellate court owes no deference to the trial court's interpretation; instead, it analyzes the agreements from scratch because the meaning of an agreement's language is a legal question rather than a factual one. *See Balazic v. Balazic*, 353 So. 3d 1234, 1235 (Fla. 5th DCA 2022), *reh'g denied* (Jan. 24, 2023). In addition, "because construction of the contract here is a question of law, we need not defer to the trial court's interpretation of this contractual provision; instead, we are guided first by the language of the contract itself." *Id.* (citation omitted).

Second, it is a fundamental tenet of contract interpretation that the entirety of the parties' agreement must be construed in its totality and that the language used must not be parsed in a way that ignores the overall purpose of the venture. *See Salyer v. Tower Hill Select Ins. Co.*, 367 So. 3d 551, 555 (Fla. 5th DCA 2023) ("[W]hen construing the language of a contract, courts are to be mindful that the goal is to arrive at a reasonable interpretation of the text of the entire agreement to accomplish its stated meaning and purpose." (quoting *Sidiq v. Tower Hill Select Ins. Co.*, 276 So. 3d 822, 827 (Fla. 4th DCA 2019) (emphasis and internal citation omitted))); *see also Boyle v. Orkin Exterminating Co., Inc.*, 578 So. 2d 786, 787 (Fla. 4th DCA 1991) (finding in an action brought against exterminator for breach of contract that the interpretation of the contract could be determined by looking at the plan of

---

[5] Whetstone's motion was initially stricken in error, but the trial court later denied it on May 1, 2023.

13

operation as a whole, including the principal object and overall purpose of the agreement).

Here, the License and Manufacturing Agreements are two pieces of a puzzle that must fit together; they were executed together and in conjunction with each other. The most salient, if not dispositive, feature of the agreements is that the License Agreement did not allow for early termination; only the Manufacturing Agreement had this feature. Which makes total sense given the overall purpose and structure of the relationship was to use the Whetstone patents.

Whetstone held the exclusive patent rights for the production of a chocolate and toy product in North America. The useful lives of its patents were drawing to an end, making it critical that Whetstone maximize revenues before they expired. As a result, the License Agreement made clear that it continued in place until its expiration date on December 31, 2027, i.e., when the patents ran out. It would make no economic sense for Whetstone to have allowed unilateral termination of the License Agreement before that date; doing so risked significant non-recoverable economic losses. This is why the License Agreement allowed for early termination only upon a party's uncured breach within 30 days after notice; it did not allow for unilateral termination for whatever reason . . . or no reason.

The Manufacturing Agreement, in sharp contrast, had no specific end-date and it allowed either party to terminate the agreement for "convenience" with twelve-months' notice. It could be terminated for cause on the same basis as permitted in the License Agreement, but it allowed either party to unilaterally terminate the agreement for "convenience." That the Manufacturing Agreement allowed for unilateral termination, and the License Agreement did not, speaks volumes. Its inclusion in the Manufacturing Agreement allowed either party to halt the *production* of Yowies *by Whetstone* for any reason. Whetstone could back out, as could YNA, from their manufacturing relationship.

Termination of the manufacturing relationship, however, did not mean the production of Yowies was at an end. To the contrary, it was envisioned that production of Yowies would continue, but

14

only pursuant to the License Agreement that was in place until 2027. The License Agreement envisioned only two scenarios. In one, the parties would have an *exclusive* relationship whereby Whetstone's patents *and* its manufacturing facilities were used to produce Yowies for YNA; this is the path the parties initially followed. In this situation, YNA was required to pay *minimum* fees that were necessary to maintain its *exclusive* use of the Whetstone patents. *See* Appendix (Minimum Fees to Maintain Exclusive Rights – original and amended). For example, YNA was required to pay $800,000 in 2014 (after a negotiated downward adjustment) and $1,500,000 in 2015 for exclusive use rights.

The other scenario allowed for the *nonexclusive* use of the Whetstone patents. In this situation, YNA would be allowed to use the patents in concert with a manufacturer other than Whetstone. For example, if YNA decided to partner with a different manufacturer other than Whetstone, it could do so but must pay a minimum fee for the *non-exclusive* use of the patents. For example, YNA would be required to pay $400,000 in 2014 (after a negotiated downward adjustment) and $700,000 in 2015 for non-exclusive rights. Under this scenario, Whetstone was allowed to license the use of its patents with other manufacturers and was free to use the patents in its own products.

By unilaterally terminating the License Agreement, YNA committed a breach of its terms. YNA had no contractual right to renege its obligations under the License Agreement via early termination for its convenience; it could not simply walk away from an agreement that would be operative until December 31, 2027. It could terminate its obligations upon proof that Whetstone committed an uncured breach, but that was not alleged. Under the License Agreement YNA could employ a new manufacturer other than Whetstone to produce Yowies, but it could not abandon the agreement for its convenience simply because it felt it "no longer require[d] use of the patents."

Under sections 7 and 14 of the License Agreement, Whetstone as the "non-breaching party" was entitled to "pursue any and all remedies to which it may be entitled at law, in equity or under [the agreement] due to the breach by the other party." YNA claims that Whetstone is not entitled to relief because the License Agreement

15

does not explicitly say that it was required to pay one or the other fee for the term of the agreement; it likewise does not say that YNA could unilaterally walk away and effectively cut short the duration of the fee obligation through December 31, 2027. The context of the agreements and their interlocking purpose[6] reflect that the License Agreement and its exclusive/non-exclusive fee options meant that YNA was on the hook to pay one or the other; it could not get new leadership who wished to rewrite the agreement to its liking.

In conclusion, the most reasonable interpretation of the License Agreement, read in conjunction with its sibling Manufacturing Agreement, is that YNA was required to pay an annual fee for the exclusive or non-exclusive use of the Whetstone patents; it would be unreasonable to allow YNA the unilateral right to walk away from its obligations under the facts presented. *See Herian v. Se. Bank, N.A.*, 564 So. 2d 213, 214 (Fla. 4th DCA 1990) ("An interpretation of a contract which gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect."); *see also Prestige Rent-A-Car, Inc. v. Advantage Car Rental & Sales, Inc. (ACRS)*, 656 So. 2d 541, 545 (Fla. 5th DCA 1995) (same). As such, the findings and final judgment concluding that YNA did not breach the License Agreement by terminating it for convenience should be vacated and the trial court on remand should enter judgment for Whetstone and award damages and interest that are proven.

---

[6] Both agreements contained cross-default provisions whereby a "default under one shall, at the option of Whetstone or the Whetstone entity, be a default under all."

16

# APPENDIX

## 2. Minimum Fees to Maintain Exclusive Rights:

. . .

| Year | Before Change Fee Amount | New Fee Amount |
|------|--------------------------|----------------|
| 2013 | $150,000 | $150,000 |
| 2014 | $800,000 | $600,000 |
| 2015 | $1,500,000 | $900,000 |
| 2016 | $2,000,000 | $1,370,000 |
| 2017 | $3,000,000 | $1,370,000 |
| 2018 | $3,000,000 | $1,370,000 |
| 2019 | $3,000,000 | $1,370,000 |

## 3. Minimum Fees to maintain Non-Exclusive Rights:

| Year | Before Change Fee Amount | New Fee Amount |
|------|--------------------------|----------------|
| 2013 | $150,000 | $150,000 |
| 2014 | $400,000 | $250,000 |
| 2015 | $700,000 | $400,000 |
| 2016 | $1,000,000 | $500,000 |
| 2017 | $1,000,000 | $500,000 |
| 2018 | $1,000,000 | $500,000 |
| 2019 | $1,000,000 | $500,000 |